RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0133p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

CHARLES GARY-DON ABBEY,

        *Defendant-Appellant.*

No. 07-2278

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 06-20286—Paul V. Gadola, District Judge.

Argued: January 20, 2009

Decided and Filed: April 3, 2009

Before: MARTIN and COOK, Circuit Judges, WATSON, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Richard M. Lustig, RICHARD M. LUSTIG LAW OFFICE, Birmingham, Michigan, for Appellant. Robert W. Haviland, ASSISTANT UNITED STATES ATTORNEY, Flint, Michigan, for Appellee. **ON BRIEF:** Richard M. Lustig, RICHARD M. LUSTIG LAW OFFICE, Birmingham, Michigan, for Appellant. Robert W. Haviland, ASSISTANT UNITED STATES ATTORNEY, Flint, Michigan, for Appellee.

_____

**OPINION**

_____

    BOYCE F. MARTIN, JR., Circuit Judge. Former Burton, Michigan, City Administrator Charles Abbey was convicted of conspiracy to bribe a public official

---

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

under 18 U.S.C. § 371 and 18 U.S.C. § 666(a)(2), solicitation of a bribe by a public official under 18 U.S.C. § 666(a)(1), and extortion by a public official under the Hobbs Act, 18 U.S.C. § 1951. Though covering three crimes and two statutes, Abbey's appeal boils down to a single assertion: that the government, to sustain a conviction under 18 U.S.C. § 666 or the Hobbs Act, 18 U.S.C. § 1951, must prove a direct link between a specific gift given to a public official and an explicit promise by that official to perform a specific, identifiable official act in return. Though Abbey is correct that the government did not prove such a link at trial and that the jury instructions did not so instruct, we nevertheless reject his argument because neither statute contains such a heightened requirement. We thus affirm Abbey's convictions and sentence.

## I.

Albert Louis-Blake Rizzo, a local land developer, implicated Abbey in statements he made to county prosecutors following the filing of perjury and fraud charges against him. Rizzo stated that he had given numerous bribes to various Burton public officials, including Mayor Charles Smiley and defendant Abbey.[1] He further claimed that he gave Abbey a free subdivision lot in return for unspecified future official favors. These statements formed the basis of Abbey's federal indictment.

Trial testimony indicated that Abbey had been looking for a lot to build a new home on. Rizzo had one, and, after some machinations (the lot was deeded to Rizzo's secretary and possible mistress, who then deeded it to Abbey) Abbey received it without any cash exchanging hands. Rizzo testified that, in giving Abbey the lot "for free," he had hoped that he would be considered favorably for future Burton real-estate developments. Abbey argued that the lot was not free because he paid various encumbrances to clear title after receiving it and that this equaled what he believed the land was worth. Abbey also denied exerting public influence in Rizzo's favor in any other way.

---

[1]Rizzo eventually pleaded guilty to two state offenses: misdemeanor insurance fraud for allowing his friend to drive off in his Corvette and then falsely reporting it stolen, and for paying an illegal bribe to Burton Mayor, Charles Smiley.

The government did not introduce any evidence establishing that, when the lot was transferred, Rizzo and Abbey had an express agreement for a specific official act to be done in return for Rizzo's gift. The government did assert, however, that Abbey used his influence and position to assist Rizzo with several land developments, including one in particular—Pebble Creek. The government also produced evidence that, roughly a year after the free lot transfer, Abbey proposed that the City issue municipal bonds to finance Pebble Creek's development. At that time, though Rizzo had already contracted to purchase Pebble Creek, the title change had not yet become public. And, despite the fact that the sale was already final, it was the seller—and not Rizzo—that publicly petitioned for a municipal bond issue. After financing was agreed upon but without a formal bidding process, Rizzo was named general contractor to develop Pebble Creek (even though he owned it). The government characterized this arrangement as the City of Burton paying Rizzo with municipal bond financing to develop his own property.

An initial contracting fee was agreed upon but Rizzo protested. In response, officials substantially increased Rizzo's fee after he met with city officials, including Abbey. Thus, in 2003, Rizzo received an initial payment of $199,222.14 and, six months later, another payment of $124,166.93. The City characterized this latter fee as "Overhead and Profit" on the Pebble Creek project. Rizzo was allowed to handle the improvements and contracting as he wished and to submit his invoice at the end, rather than up front.

The jury found Abbey guilty of conspiracy to bribe a public official under 18 U.S.C. § 666(a)(2), solicitation of a bribe by a public official under 18 U.S.C. § 666(a)(1)(B), and extortion under color of right under the Hobbs Act, 18 U.S.C. § 1951. He was sentenced to fifteen months in prison, and now appeals. He remains free on bond.

## II.

Abbey challenges (A) his indictment and the jury instructions for his Hobbs Act conviction, 18 U.S.C. § 1951, (B) the jury instructions for his conviction of bribery under 18 U.S.C. § 666, and (C) his sentence.

### A.    Hobbs Act

A jury found Abbey guilty of committing extortion by a public official under the Hobbs Act, 18 U.S.C. § 1951. Abbey challenges the district court's denial of his motion to dismiss and his Rule 29 motion for acquittal, along with the denial of his request for an additional jury instruction.  All three challenges reduce to the contention that the Hobbs Act required the government to prove that Abbey made an express promise to perform for Rizzo a specific, identifiable official act in return when the land was given to him.

The Hobbs Act criminalizes interference with interstate commerce by extortion (along with attempts or conspiracies to do so), 18 U.S.C. § 1951(a), and defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right," *id.* at § 1951(b)(2). Abbey challenges his conviction for extortion "under color of official right."

In *McCormick v. United States*, 500 U.S. 257 (1991), the Supreme Court considered the requirements for an extortion conviction under color of official right in the context of campaign contributions. The Court concluded that the receipt of political contributions violates the Hobbs Act "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.* at 273. The *McCormick* Court observed, however, that the campaign contribution context was unique because almost all lawful contributions are given to influence future legislative or executive actions:

> Money is constantly being solicited on behalf of candidates, who run on
> platforms and who claim support on the basis of their views and what

they intend to do or have done. Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation. It would require statutory language more explicit than the Hobbs Act contains to justify a contrary conclusion.

*Id.* So campaign contributions only run afoul of the Hobbs Act if they are "induced by the use of force, violence, or fear," or when they, "having been taken under color of official right . . . are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id. McCormick* reserved the question "whether a quid pro quo requirement exists in other contexts, such as when an elected official receives gifts, meals, travel expenses, or other items of value." *Id.* at 274 n.10.

In *Evans v. United States*, 504 U.S. 255 (1992), the Court held that an affirmative act of inducement by a public official is not an element of extortion under color of official right, *id.* at 268, and that illegal extortion is "complete[] at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the quid pro quo is not an element of the offense." *Id.* Thus, to sustain a conviction, the "Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.*[2]

This Court took its first stab at harmonizing these decisions in *United States v. Blandford*, 33 F.3d 685 (6th Cir. 1994). In *Blandford*, we stated that *McCormick*'s quid pro quo requirement should not apply outside the campaign-contribution context because

---

[2]Of course, it is not entirely obvious that the passive receipt of a bribe (without being initially solicited) should be considered "extortion" according to a traditional or colloquial understanding of that term. *See McCormick v. United States*, 500 U.S. 257, 276 (U.S. 1991) (Scalia, J., concurring). But that horse has left the barn after *Evans* and *McCormick*, and we must take the Supreme Court's standards as given.

if the quid pro quo requirement exists to ensure that an otherwise permissible activity is not unfairly criminalized, then an opposite presumption is likely appropriate when a public official obtains cash or property outside the campaign system because there are few legitimate explanations for such gifts. *Id.* at 697.

Nevertheless, it was not necessary in *Blandford* to resolve whether the quid pro quo requirement applied universally outside the campaign context. And two years later this Court stated in *United States v. Collins*, 78 F.3d 1021 (6th Cir. 1996), that "the quid pro quo requirement applies to all § 1951 extortion prosecutions, not just those involving campaign contributions." *Id.* at 1035. So, in this Circuit, the Hobbs Act requires the government to prove the existence of a quid pro quo.

But not all quid pro quos are made of the same stuff. The showing necessary may still vary based on context, though all cases require the existence of some kind of agreement between briber and official. *Evans* modified the standard in non-campaign contribution cases by requiring that the government show only that the official "obtain[ed] a 'payment to which he was not entitled, knowing that the payment was made in return for official acts.'" *United States v. Kelley*, 461 F.3d 817, 826 (6th Cir. 2006) (quoting *Evans*, 504 U.S. at 268). Indeed, in circumstances like this one—outside the campaign context— "[r]ather than requir[e] an *explicit* quid-pro-quo promise, the elements of extortion are satisfied by something short of a formalized and thoroughly articulated contractual arrangement (i.e., merely knowing that the payment was made in return for official acts is enough)." *United States v. Hamilton*, 263 F.3d 645, 653 (6th Cir. 2001) (quotations omitted) (emphasis added).

Moreover, the "official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods." *Collins*, 78 F.3d at 1034 n.10 (quoting *Evans*, 504 U.S. at 274) (Kennedy, J., concurring)) ("The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it."). A public official thus commits extortion "under color of official right" whenever he knowingly receives a bribe. *See Wilkie v. Robbins*, 127 S. Ct. 2588, 2605-

06 (2007) ("At common law, extortion was a property offense committed by a public official who took any money or thing of value that was not due to him under the pretense that he was entitled to such property by virtue of his office.") (quotations omitted); *id.* at 2606, ("In short, '[e]xtortion by the public official was the rough equivalent of what we would now describe as 'taking a bribe.'") (quoting *Evans*, 502 U.S. at 260).[3] And, because the "Hobbs Act is meant to prohibit public officials from obtaining property from others by extortion," *United States v. Brock*, 501 F.3d 762, 768 (6th Cir. 2007), there is no reason to impose a judicial requirement here that would make it lawful under the Hobbs Act to pay a public official to exert his influence in your favor, so long as it is premature for the agreement to contemplate specific acts.

So Abbey is wrong in contending that, to sustain a Hobbs Act conviction, the benefits received must have some explicit, direct link with a promise to perform a particular, identifiable act when the illegal gift is given to the official. Instead, it is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose. *See United States v. Bradley*, 173 F.3d 225, 231-32 (3d Cir. 1999); *United States v. Coyne*, 4 F.3d 100, 114 (2d Cir. 1993). The public official need not even have any intention of *actually* exerting his influence on the payor's behalf because "fulfillment of the quid pro quo is not an element of the offense." *Evans*, 504 U.S. at 268. The inquiry is whether the official extracted money through promises to improperly employ his public influence.[4]

---

[3]This definition comports with a familiar, common sense understanding of a corrupt quid pro quo. From the movie, *The Godfather*:

> Bonasera: I ask you for justice . . . . How much shall I pay you?
> Don Corleone: [Looks dismissively at Bonasera.] Bonasera. Bonasera. What have I ever done to make you to treat me so disrespectfully? . . . .
> [Bonasera kisses Don Corleone's ring]
> Don Corleone: Good. *Someday*, and that day may never come, I'll call upon you to do a service for me . . . .
> Bonasera: Grazie, Godfather.

*The Godfather,* 1972 (emphasis added), *available at* http://www.imdb.com/title/tt0068646/quotes.

[4] Although defendants in other cases have argued that *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999) supports the view that the government must show a direct link between the transferred property and some specific act of public influence in the payor's favor, *see, e.g., United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007), Abbey only relies on *Sun-Diamond* with respect to his arguments under 18 U.S.C. § 666. Thus, that case is analyzed in the context of that statute, but, nevertheless, we observe *Sun-Diamond* would not alter our Hobbs Act conclusion for the reasons stated

This discussion disposes of Abbey's arguments regarding the district court's denial of his motion to dismiss and his Rule 29 motion for acquittal: the indictment was proper because it did not need to assert a direct link between Abbey's receipt of property and an explicit promise to perform of a specific, identifiable act of improper influence when the gift was given.

So we turn to Abbey's challenges to his Hobbs Act jury instructions. The district court instructed:

> [1] The phrase "extortion . . . under color of official right" means the use by a public official or employee of the power and authority of the office he occupies in order to obtain money, property, or something of value from another to which that government official or employee or that government office has no official right.
>
> [2] It is not necessary for the government to prove that the public official or employee made any specific threat or used force or fear to cause a person to part with the property that the indictment alleges was obtained by the public official or that the employee or government office.
>
> [3] The government must prove beyond a reasonable doubt, however, that Mr. Abbey knowingly and deliberately used his official position in order to obtain money, property, or something of value, to which [he] had no right.[5]

Abbey requested that the following sentence be tacked on to the end of the instructions: "There must be a taking of property in exchange for specific promises to do or refrain from doing specific things."

The district court's instruction was correct: the first paragraph accurately explains the statute; the second distinguishes forcible or fear-induced extortion from extortion under color of right; and the third paragraph accurately tracks both the statute and the Supreme Court's guidance in *Evans* that the public official need not "induce" a bribe and is guilty of extortion if he knowingly receives one. *See Evans*, 504 U.S. at 268. By contrast, Abbey's proposed addendum was wrong: there need not be any "specific

---

in Part II-B.

[5] This instruction is identical to the one recommended in O'Malley, Grenig & Lee, *Federal Jury Practice and Instructions*, § 53.09 (5th ed. 2007).

promises to do or refrain from doing specific things." Instead, as the discussion above illuminates, an official commits extortion under color of official right when he knowingly accepts a bribe as part of a generalized agreement to improperly exert his official influence on the payor's behalf. That is exactly what the district court instructed, and what the jury found. We affirm Abbey's Hobbs Act conviction.

### B.    18 U.S.C. § 666

### 1.

The jury also convicted Abbey of conspiracy under 18 U.S.C. § 371 to bribe a public official under 18 U.S.C. § 666(a)(2), and corrupt solicitation of a bribe by a public official under 18 U.S.C. § 666(a)(1)(B). Similar to his argument regarding the Hobbs Act, he contends that the district court failed to properly instruct the jury that, to sustain a conviction under 18 U.S.C. § 666, the government must prove "a specific intent element" on Abbey's part "that there be a connection between [his] intent and a specific official act." Defendant's Br. at 29 (quotations omitted).

One violates 18 U.S.C. § 666(a)(1)(B) if he or she is an agent of local government and "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions" of the local government "involving any thing of value of $5000 or more." Section 666(a)(2) makes it unlawful to "corruptly give[], offer[], or agree[] to give anything of value to any person, with intent to influence or reward an agent" of the local government "involving anything of value of $5000 or more." *See* 18 U.S.C. § 371 (criminalizing the conspiracy to enter into such a scheme).[6]

By its terms, the statute does not require the government to prove that Abbey contemplated a specific act when he received the bribe; the text says nothing of a quid pro quo requirement to sustain a conviction, express or otherwise: while a "*quid pro quo* of money for a specific . . . act is sufficient to violate the statute," it is "not necessary."

---

[6] The parties do not dispute that the relevant government here receives over $10,000 under a federal assistance program. *See* 18 U.S.C. § 666(b).

*United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005). Rather, it is enough if a defendant "corruptly solicits"[7] "anything of value" with the "inten[t] to be influenced or rewarded in connection" with some transaction involving property or services worth $5000 or more. 18 U.S.C. § 666(a)(1)(B).[8]

Finding no support in the statute's text, Abbey heavily relies on *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999). In *Sun-Diamond* the Supreme Court reviewed the conviction of a trade association for providing illegal gratuities under 18 U.S.C. § 201(c)(1)(A) for giving tickets, meals, and other items to the Secretary of Agriculture. *Id.* at 401. The indictment did not allege a "specific connection" between these gratuities and any specific matter in which the Secretary had an interest. *Id.* at 401-02. Reversing the conviction, the Supreme Court held that § 201 required "a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." *Id.* at 414. *Sun-Diamond* explained that this was necessary because no other ruling would "fit comfortably with the statutory text, which prohibits only gratuities received 'for or because of any official act performed or to be performed,'" and defines "official act" as "'any decision or action on any question, matter, cause, suit, proceeding, or controversy.'" *Id.* at 406 (quoting 18 U.S.C. § 201(a)(3), (c)(1)(A)). The Court also observed that a contrary holding would criminalize a wide array of presumptively legal gift giving, like giving officials a hat or a hot dog. *Id.* at 408-11.

*Sun-Diamond*, however, is not germane to our decision today. We agree with the Second Circuit that *Sun-Diamond*'s heightened quid pro quo standard is inapplicable to both the Hobbs Act and 18 U.S.C. § 666. *See United States v. Ganim*, 510 F.3d 134 (2d

---

[7] "[T]he term 'corruptly' in criminal laws . . . denotes 'an act done with an intent to give some advantage inconsistent with official duty and the rights of others . . . . It includes bribery but is more comprehensive; because an act may be corruptly done though the advantage to be derived from it be not offered by another.'" *United States v. Aguilar*, 515 U.S. 593, 616 (U.S. 1995) (Scalia, J., concurring in part and dissenting in part) (quoting *United States v. Ogle*, 613 F.2d 233, 238 (10th Cir. 1979)).

[8] In *United States v. Brock*, this Court held that, under the Hobbs Act, the payor of a bribe to a state official cannot "conspire with that official to extort property from himself in violation of the Hobbs Act." 501 F.3d at 764. Unlike the Hobbs Act, which defines "extortion" as the "obtaining of property *from another*," 18 U.S.C. § 1951 (emphasis added), section 666 speaks only in terms of offers and solicitations "involving anything of value." *Id.* at § 666(a)(1)(B), (a)(2). Thus, one can be convicted of conspiring to bribe themselves because they are still part of a conspiracy that seeks to corrupt the public sphere.

Cir. 2007). First, *Sun-Diamond* concerned a markedly different statute than either 18 U.S.C. § 666 or the Hobbs Act. *Id.* at 146. Specifically, neither § 666 nor the Hobbs Act contains the "official act" language that the *Sun-Diamond* Court found "pregnant with the requirement that some particular official act be identified and proved." *Sun-Diamond*, 526 U.S. at 406. Second, the Court's concern with not criminalizing legal gratuities is not relevant here because § 666 contains both a corrupt intent requirement and a requirement that the illegal gift or bribe be worth over $5,000. And, finally, when the *Sun-Diamond* Court stated that bribery requires "a *quid pro quo*—the specific intent to give or receive something of value *in exchange for* an official act," 526 U.S. at 404-05 (emphasis in original), it stated it in the context of a statute that was "merely one strand of an intricate web of regulations, both administrative and criminal, governing the acceptance of gifts and other self-enriching actions by public officials," *id.* at 409. But not so with § 666 and the Hobbs Act—"[u]ndergirding the Court's decision in *Sun-Diamond* was a need to distinguish legal gratuities (given to curry favor because of an official's position) from illegal gratuities (given because of a specific act)." *Ganim*, 510 F.3d at 146. There is thus simply no good reason, either in text or policy, to inject *Sun-Diamond*'s heightened requirements into § 666 (or the Hobbs Act).

So the proper approach here is to hew to the statute's language: an official violates § 666 if he "corruptly" accepts (or gives, or conspires to give) something of value "intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5000 or more." 18 U.S.C. § 666. The district court's jury instructions were not improper for failing to include a requirement that the government prove a direct link from some specific payment to a promise of some specific official act. Instead, the jury was only required to find what it did—that Abbey accepted property with the corrupt intent to use his official influence in Rizzo's favor.

**2.**

There is a final loose-end to tie up regarding Abbey's § 666 conviction. Although his argument is vague, Abbey appears to claim that 18 U.S.C. § 666's requirement that the "thing of value" given to the official be worth "$5000 or more" carries the statute's mens rea such that his conviction should be overturned because the jury was not instructed to find that he subjectively thought the land was worth more than $5000. Defendant's Br. at 35. This is a red herring: the government is not required to prove this to sustain a § 666 conviction.

The relevance of the $5000 threshold is to avoid prosecutions for minor kickbacks and limit violations to cases of outright corruption, like Abbey's. Indeed, it is not evident how § 666's mens rea element ("corruptly") would modify a person's subjective interpretation of how much something was worth. (No one would say that someone "nefariously" believed that some property was worth over $5000.) Instead, that term does the job Congress intended it to do: officials are only guilty if they take a bribe with corrupt intent. The government and jury need not read Abbey's mind to know how much he thought the property was worth to sustain a proper conviction.

Following from his reading of the mens rea element, Abbey requested that the district court take judicial notice of an array of Michigan real-estate laws, including laws regarding the mechanics of quitclaim and warranty deeds. Abbey's counsel stated that this was necessary so he could "get an instruction on the subjective view of value." But, because the "subjective view of value" is irrelevant, the district court properly refused Abbey's request. Though the district court did not specifically cite to the federal rules of evidence, its accurate view that such instructions were irrelevant at best (and misleading at worst) was enough because it is evident that the court did not feel that Rules 401, 402, or 403 required admission. It thus committed no reversible error. *See United States v. Franco*, 484 F.3d 347 352 (6th Cir. 2007) (observing that even if it "presume[d] that the district court failed to properly weigh the evidence under 403, and that such failure constitutes an abuse of discretion, we still find that a new trial is unwarranted" because the record supported the balancing).

**III.**

Finally, Abbey challenges his sentence. He argues that the district court improperly found that the "thing of value" that he received—a quitclaim deed to the free lot from Rizzo—was worth more than $20,000 for purposes of calculating his total offense level under the federal Sentencing Guidelines. Under the 2000 Guidelines Manual, § 2C1.1(b)(2)(A) (which references the loss table at § 2F1.1(b)(1)(E)), four levels must be added if the value of the item received was over $ 20,000.[9] The district court needed only to find that the property was worth over $20,000 by a preponderance of the evidence, *United States v. White*, 551 F.3d 381, 385 (6th Cir. 2008) (en banc), but Abbey argues that the evidence submitted was insufficient to support even this threshold because the land's proper value was only $2000, *see Gall v. United States*,128 S. Ct. 586, 597 (2007) ("Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard. It must first ensure that the district court committed no significant procedural error, such as failing to calculate (*or improperly calculating*) the Guidelines range . . . .") (emphasis added).

Abbey argues that the land was basically worthless because he had to pay certain assessments on it after receipt, and further that the only relevant criteria was his subjective impression of the property's value. Two responses. First, the commentary to § 2F1.1 states that "Valuation of loss is discussed in the Commentary to § 2B1.1," and Application Note 2 to § 2B1.1 states: "'Loss' means the value of the property taken, damaged, or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue." The term "fair market value" means "objective" and Abbey's argument that the standard is subjective is thus foreclosed.

Second, regarding the court's objective basis for determining that the property was worth at least $20,000, the government offered sufficient evidence to support the

---

[9]There was some dispute regarding whether the November 2000 version of the Guidelines Manual (which required the government to prove that the property's value was over $ 20,000 to justify a four-level increase) or the 2001 version (which only required that the value was over $ 10,000 to justify a four-level increase) applied. The district court assumed that the 2000 version applied, and, because the court's conclusion as to value was correct, there is no reason to wade into that dispute.

district court's conclusion.  Specifically, in addition to the fact that many of the surrounding lots were sold for more than $20,000 after assessments were paid, the ELGA Credit Union of Burton, Michigan—with whom Abbey sought a mortgage—estimated the lot's value to be $40,000. And the district court also observed that Abbey's lot was likely one of the most desirable lots in the subdivision because it was the only one with acres of open land bordering two different sides. So the district court's determination that the lot here was worth more than $20,000 was not clearly erroneous, and Abbey's sentence was proper.

**IV.**

For the above reasons, we AFFIRM Abbey's convictions and sentence.