*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0060p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
─────────────────

AMERICAN PREMIER UNDERWRITERS, INC.;
AMERICAN FINANCIAL GROUP, INC.,
*Plaintiffs-Appellants*,

No. 11-4054

*v.*

NATIONAL RAILROAD PASSENGER
CORPORATION, aka Amtrak,
*Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:08-cv-346—S. Arthur Spiegel, District Judge.

Argued: October 5, 2012

Decided and Filed: March 5, 2013

Before: COLE and KETHLEDGE, Circuit Judges; THAPAR, District Judge.[*]

─────────────────

## COUNSEL

**ARGUED:** Michael L. Cioffi, BLANK ROME LLP, Cincinnati, Ohio, for Appellants. Pierre H. Bergeron, SQUIRE SANDERS (US) LLP, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Michael L. Cioffi, Thomas H. Stewart, BLANK ROME LLP, Cincinnati, Ohio, for Appellants. Pierre H. Bergeron, Rachael A. Harris, SQUIRE SANDERS (US) LLP, Cincinnati, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

COLE, Circuit Judge. Plaintiffs-Appellants American Premier Underwriters, Inc. and American Financial Group, Inc. (collectively "APU") appeal the district court's

─────────────────

[*]The Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

dismissal of five of its claims against Defendant-Appellee National Railroad Passenger Corporation ("Amtrak"). For the following reasons, we reverse in part and affirm in part.

I.

Congress enacted the Rail Passenger Service Act of 1970 ("RPSA") to "avert the threatened extinction of passenger trains in the United States," *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 383 (1995), by creating a "rail passenger corporation for the purpose of providing modern, efficient, intercity rail passenger service," known today as "Amtrak." Pub. L. No. 91-518, § 101, 84 Stat. 1327, 1328 (1970). Struggling railroads could, under the RPSA, be excused from providing intercity rail passenger service by entering into a contract with Amtrak. *See id.* § 401.

In April of 1971, after filing for bankruptcy the prior year, the trustees of the Penn Central Transportation Company ("PCTC"), now American Premier Underwriters, Inc., decided to take advantage of § 401 of the RPSA. PCTC contracted under the "Basic Agreement" to (1) pay Amtrak half of the amount of PCTC's 1969 losses ($52 million); and (2) provide Amtrak with the use of its tracks, facilities and services. In return, Amtrak was to, among other things, (1) relieve PCTC of its "entire responsibility" for the provision of intercity rail passenger service; and (2) issue to PCTC one share of common stock for every ten dollars paid by PCTC to Amtrak, i.e., approximately 5.2 million shares.

PCTC elected to receive the stock shares instead of a tax deduction for the $52 million amount. *See* RPSA §§ 401(a)(2), 901. The $52 million payment was described as "in consideration of" Amtrak's relieving PCTC of rail service responsibility. The stock issue was not described this way; the agreement merely said that it would take place "promptly after" the $52 million payment.

In 1978, as part of PCTC's reorganization, PCTC and Amtrak entered into the "1978 Settlement Agreement," whereby they agreed to release all then-existing claims against each other, as well as all claims arising from events prior to March 31, 1976.

In 1997, Congress enacted the Amtrak Reform and Accountability Act of 1997 ("1997 Act"), seeking to "improve Amtrak's financial condition" and ensure its survival by providing it with "additional flexibility" to "operate in a businesslike manner . . . to manage costs and maximize revenues." Pub. L. No. 105-134, § 2, 111 Stat. 2570 (1997). Section 415(b) of the 1997 Act, titled "Redemption of Common Stock," said: "Amtrak shall, before October 1, 2002, redeem all common stock previously issued, for the fair market value of such stock." *Id.* § 415(b).

A full decade after the deadline, Amtrak has redeemed none of APU's stock, and each party blames the other. In 2000, APU rejected Amtrak's redemption offer of $0.03 per share. The two negotiated until January 2008, when Amtrak allegedly refused to consider any alternative transaction to redeem the stock, such as an exchange of assets instead of cash. APU filed its complaint on May 19, 2008.

In their original complaint, American Premier Underwriters, Inc. and its parent American Financial Group (the beneficial owner of APU's Amtrak stock) made seven claims: (1) Amtrak caused the value of its stock to erode and thereby effected a taking without just compensation of APU's shares in violation of the Takings Clause of the Fifth Amendment ("takings claim"); (2) APU is entitled to restitution of the $52 million payment under state law; (3) Amtrak converted APU's shares when it failed to redeem them; (4) Amtrak's "irrational" valuation of APU's shares deprived APU of a protected property interest in violation of the Due Process Clause of the Fifth Amendment ("due process claim"); (5) Amtrak's valuation denied APU procedural due process because the self-interested Amtrak was the sole fact-finder, the valuation was arbitrary and APU was denied notice and an opportunity to be heard in the valuation process ("procedural due process claim"); (6) Amtrak's valuation denied APU substantive due process by valuing the stock at the "unfair" amount of $0.03 per share ("substantive due process claim"); and (7) Amtrak failed to comply with its obligations under § 415(b) and APU has a valid statutory private right of action as a result ("ARAA claim").

APU sought monetary damages in all of these claims, except for the due process claim, in which APU sought a declaratory judgment that Amtrak's implementation of

§ 415(b) violated constitutional due process, along with commencement of eminent domain proceedings for the redemption of the shares.

The district court granted Amtrak's motion to dismiss, finding that APU failed to state a single valid claim. It dismissed the second and third claims on state law grounds. The district court found that Amtrak "qualifie[d] as an agency for the purpose of seeking redress of constitutional violations," which led it to dismiss the first, fifth and sixth claims on the grounds that federal agencies cannot be sued for monetary damages for their constitutional violations. The district court then found that § 415(b) did not create a private right of action for Amtrak shareholders, like APU, to sue for redemption. As a result, the district court dismissed the fourth and seventh claims.

Though it did not need to reach the issue, the district court held that, if any of APU's claims had been viable, it would not have dismissed them under either a statute of limitations or the 1978 Settlement Agreement because further factual inquiry would have been required.

## II.

APU appeals the district court's grant of Amtrak's motion to dismiss as to the five federal law claims. We review the district court's decision to dismiss the complaint de novo, to determine whether the facts pleaded in the complaint are sufficient to state a plausible claim. *See Mediacom Se. LLC v. BellSouth Telcomms., Inc.*, 672 F.3d 396, 398, 400 (6th Cir. 2012).

## A.

The district court did not err in dismissing APU's takings claim, procedural due process claim, and substantive due process claim. Even in the absence of sovereign immunity, a federal agency cannot be sued under an implied cause of action for monetary damages that stem from the agency's constitutional violations. *FDIC v. Meyer*, 510 U.S. 471, 486 (1994). Like the district court, we read *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995) to mean Amtrak is a federal agency for the

purpose of seeking redress of constitutional violations, and, accordingly, that *Meyer* bars these three claims.

In *Lebron*, Michael A. Lebron sued Amtrak for violating his First Amendment rights by refusing to display his billboard advertisement for political reasons. *Id.* at 376-77. The district court entered judgment for Lebron, ordering Amtrak to display his advertisement for two months. *Lebron v. Nat'l R.R. Passenger Corp. (Amtrak)*, 811 F. Supp. 993, 1005 (S.D.N.Y. 1993), *rev'd*, 12 F.3d 388 (2d Cir. 1993), *rev'd*, 513 U.S. 374 (1995). The Second Circuit reversed and remanded, holding that Amtrak could not be held liable because it was "not a governmental actor subject to . . . the First Amendment," 12 F.3d 388, 389 (2d Cir. 1993), *rev'd*, 513 U.S. 374 (1995), and instructing the district court to dismiss the suit, *see id.* at 393. On appeal to the Supreme Court, Amtrak denied being a government entity, pointing to the disclaimer of agency status in its authorizing statute. *Lebron*, 513 U.S. at 392 (citation omitted). The Supreme Court held that agency status was not "within the power of Congress to eliminate." *Id.* at 394. Although the disclaimer sufficed to strip Amtrak of sovereign immunity, *id.* at 392 (citation omitted), the Supreme Court held that Amtrak was "an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution." *Id.* at 394. Effectively, Amtrak's agency status served as the hook for its liability.

In *FDIC v. Meyer*, 510 U.S. 471 (1994), the Supreme Court held that a federal agency could not be sued under an implied cause of action for monetary damages stemming from a constitutional violation. *Id.* at 486. After his discharge, John Meyer sued the agency for depriving him of a property right without due process of law in violation of the Fifth Amendment. *See id.* at 473-74. Meyer framed his suit as a *Bivens* challenge, i.e., an implied cause of action for damages from a constitutional violation by the FDIC. *See id.* at 474 (explaining that *Bivens* had "implied a cause of action for damages against federal agents who allegedly violated the Fourth Amendment"); *see also Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). The Court held that a statute waived the FDIC's sovereign immunity, *Meyer*, 510 U.S. at 483, but did

not permit the suit because it refused to "imply a damages action directly against federal agencies," leading to the conclusion that federal agencies can only be sued for monetary damages pursuant to an express statutory cause of action. *See id.* at 485-86; *id.* at 486 n.11. In *Meyer*, the FDIC's agency status precluded the action against it.

APU propounds an improbable interpretation of *Lebron* that would saddle Amtrak with all the obligations of a federal agency without any of the concomitant advantages. APU argues that *Lebron* makes Amtrak enough of a government agency to be sued for violating the First Amendment, but not enough of a government agency for *Meyer* to apply and bar constitutional suits for monetary damages. Amtrak responds by pointing out that only equitable relief was at issue in *Lebron* and no monetary damages were sought, such that *Lebron* was entirely compatible with Amtrak being considered a government agency for purposes of *Meyer*.

APU makes several arguments for why *Meyer* does not apply, all of which can be characterized as attempts to limit the holding in *Meyer*. APU argues that *Meyer* applies only (1) to vicarious liability claims; (2) where a direct action is unavailable; (3) where agency behavior is systematically wrongful in a manner that is not attributable to one or more individual bad actors; and (4) where there is danger of "greatly expanding the federal government's exposure to claims for monetary damages."

APU's first argument fails. When *Meyer* speaks of declining to "exten[d] . . . *Bivens* to agencies," *id.* at 486, it makes no distinction between vicarious and direct liability. *Meyer* describes the plaintiff as requesting to "expand the category of defendants," implying that a refusal to do so keeps agencies from being defendants in any kind of damages action for constitutional violations. *See id.* at 484.

APU's second argument hinges on its overbroad reading of *Lebron*. APU argues that *Meyer* only refused to extend *Bivens* actions to agencies against whom direct action was unavailable, but Amtrak is not such an agency because, under *Lebron*, direct action was permitted against Amtrak. Therefore, argues APU, *Meyer* does not apply to this case. However, the *Bivens* remedy was implied in part because a direct action *for damages* was not available. *See Bivens*, 403 U.S. at 409-10 (Harlan, J., concurring).

*Lebron* only proves that direct action for injunctive relief is available against Amtrak; it is silent on the matter of damages. The availability of direct action for injunctive relief does not necessarily imply the availability of a direct action for damages. *See, e.g. Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (refusing to extend *Bivens* to private corporation acting under color of federal law because plaintiffs could sue for injunctive relief). Therefore, *Lebron* does not preclude the applicability of *Meyer* to the instant case.

APU's third and fourth arguments against applying *Meyer* not only lack supporting authority, but also are in tension with each other. While it is true that this case does not involve misconduct by a few individual bad actors in need of individual deterrence, *see Meyer*, 510 U.S. at 485, APU cites no case law where the presence of systematic, institutionally condoned federal agency misbehavior permits direct suit against agencies for damages for constitutional violations. Holding categorically that *Meyer* does not apply in such cases would almost certainly open the "floodgates" for claims against federal agencies that APU's fourth argument claims will not open if a direct action for damages is permitted in this case. Even assuming, for the sake of argument, that APU's projections are correct, this proves, at most, the absence of one "special factor[] counseling hesitation" to imply a right of action. *See Bivens*, 403 U.S. at 396.

APU cites no case law suggesting that an expectation of few future claims affirmatively militates in favor of extending *Bivens*. Its suggestion that this Court "limit[] its holding to the unique facts and circumstances of this case," amounts to a tacit admission that existing case law fails to support its position. We see no reason to go out on a limb to narrow the holding of *Meyer* in a manner that would "expand the category of potential defendants against whom *Bivens*-type actions may be brought," *Meyer*, 510 U.S. at 484, regardless of whether a flood or a mere trickle of new lawsuits results.

Even with a statutory waiver of sovereign immunity, Amtrak, like the FDIC, cannot be sued for its constitutional violations under an implied right of action. Congress cannot strip an agency of its status. *See Lebron*, 513 U.S. at 392-93 ("[I]t is

not for Congress to make the final determination of Amtrak's status as a Government entity . . . . That the Congress chose to call it a corporation does not alter its characteristics . . . ." (quotation omitted)); *id.* at 397-98 (enumerating the characteristics of Amtrak that make it like an agency).  The limitation on suing federal agencies for damages in constitutional rights violation cases is not related to immunity, but is merely the absence of an implied cause of action.  That is why the FDIC, which had waived sovereign immunity, could not be sued in *Meyer*. *See* 510 U.S. at 484.  Likewise, Amtrak—which lacks sovereign immunity—possesses the status of a "Government entity" with regard to its constitutional rights violations, and therefore cannot be sued for damages for such violations under *Meyer*.

Ultimately, APU cannot have it both ways.  If Amtrak is merely a private corporation carrying out a federal mandate, it cannot be sued for damages for constitutional violations. *Malesko*, 534 U.S. at 74.  If Amtrak is a federal agency for the purpose of individual rights guaranteed against the government by the Constitution, then it must be treated like a federal agency in suits for the violation of individual constitutional rights.  Therefore, *Meyer* applies and Amtrak cannot be sued for damages for its constitutional violations.  It is not for this Court to declare a new third category of federal-private-agency-corporations to be "limited to the facts" of this "unique" case.

We agree with the district court that APU may not sue Amtrak for monetary damages stemming from its alleged constitutional violations.  APU's takings claim, procedural due process claim and substantive due process claim (all of which seek monetary damages), are therefore not viable.

B.

The district court did not err in dismissing APU's ARAA claim because § 415(b) does not create a private right of action, either express or implied. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("[P]rivate rights of action to enforce federal law must be created by Congress.").

We reject APU's contention that the use of the word "shall" in § 415(b) expressly creates a private right of action because "a legal obligation implies and presumes the existence of a correlative right *that can be enforced*." (emphasis added). *See Alexander*, 532 U.S. at 286 ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create *not just a private right but also a private remedy*." (emphasis added) (citation omitted)). It is true that in the absence of a private right of action, the performance of an obligation may be, as APU complains, "subject to [the] whims" of the obligor. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 579 (1979) ("[E]ven if [the result reached sanctions injustice], the argument is made in the wrong forum, for we are not at liberty to legislate. If there is to be a federal damages remedy under these circumstances, Congress must provide it."). Nonetheless, the existence of an explicit obligation does not expressly create a right of action. However, a right of action may still be implied from the statutory text. *See Cort v. Ash*, 422 U.S. 66 (1975).

To determine whether § 415(b) implies a right of action, we consider four factors, with special emphasis on the second:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted . . . ? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law . . . ?

*id.* at 78 (internal quotation marks and citations omitted); *Ellison v. Cocke Cnty., Tenn.*, 63 F.3d 467, 470 (6th Cir. 1995) (explaining that the Supreme Court has "clarified that. . . the focal point [of the analysis] is Congress's intent in enacting the statute" (quoting *Thompson v. Thompson*, 484 U.S. 174, 179 (1988)).

Amtrak shareholders are not a class for whose especial benefit Congress enacted § 415(b) of the 1997 Act. Like the district court, we reject APU's contention that § 415(b) was enacted solely to benefit shareholders, not future lenders or the public. We agree with the district court that Congress's intent was "to create greater financing

options for Amtrak," and that any benefit to shareholders was incidental. This understanding is consistent with available evidence of legislative intent, *see infra*, and the text of the statute as a whole, which does not mention shareholders. APU cites no evidence of an especial concern, or any concern at all, for shareholders as a class.

The fact that only four shareholders existed at the time of enactment does not change our analysis. We are not aware of, and APU does not provide, any authority that supports an inverse correlation between the number of potential statutory beneficiaries and the strength (or existence) of Congressional intent to provide said beneficiaries, as a class, with an "especial benefit." Thus, the first factor militates against finding an implied right of action on behalf of APU.

As to the second, most important, *Cort* factor: APU argues (1) that the text of § 415(b) demonstrates congressional intent to create a private right of action; and, in the alternative, (2) that there is no need to show congressional intent to create a private right of action because a right without a remedy is unjust, Congress did not explicitly disclaim such a right, and the legislative history and structure of the 1997 Act provide such a right.

The cases cited by APU for the first proposition fail to support it. *Cenzon-Decarlo v. Mt. Sinai Hosp.*, No. 09 CV 3120(RJD), 2010 WL 169485, at *4 (E.D.N.Y. Jan. 15, 2010), which APU cites to demonstrate that "shall" is "classic individual rights-creating language . . . under which implied rights of action have been found," actually undermines APU's claim in this case. The statute in that case, like § 415(b), "sp[oke] to the . . . entity" being commanded—the employer—rather than to the employees who benefitted from the command. *Id.* The court found that no implied right of action was created on behalf of the benefitted employees, even though the statute—*unlike* § 415(b)—mentioned them in its text. *See id.* at *1-2 (the relevant statutory provisions say, among other things, that "[n]o entity . . . may discriminate in the employment . . . of any physician or other health care personnel"). In this case, where shareholders are not even mentioned, the *Cenzon-Decarlo* court would surely also find no implied right of action. APU also claims that *Fox v. Johnson & Wimsatt*, 127 F.2d 729, 734 (D.C. Cir.

1942), establishes stock redemption as a "traditional right" that "matures into an enforceable right when the conditions specified materialize." However, *Fox* deals with contractual rights generated by the exercise of an option, *see id.* at 730-31, and has nothing to do with teasing out an implied private right of action from a federal statutory obligation.

APU's alternative arguments also fail to persuade us that Congress intended a private right of action to be implied from § 415(b). The argument that a right without a remedy is unjust simply presumes, without proving, an intent to create a right. The fact that Congress did not explicitly deny the possibility of the statute creating a private remedy is not evidence of Congress's intent to create one. *See Bowling Green v. Martin Land Dev. Co., Inc.*, 561 F.3d 556, 559-60 (6th Cir. 2009) ("[A]bsent congressional intent to create a private remedy, . . . 'courts may not create [a cause of action], no matter . . . how compatible with the statute.'" (quoting *Alexander*, 532 U.S. at 287-88)).

APU's final alternative argument is that the legislative history and structure of the act demonstrate congressional intent to create a private right of action because the 1997 Act contains no alternative remedy. Although the Attorney General may sue Amtrak to enforce the 1997 Act, shareholders may not compel him to do so. *See* 49 U.S.C. § 24103(a). APU claims that finding a private right of action here would be "[i]n the language and spirit of *Cannon* [*v. University of Chicago*, 441 U.S. 677 (1979)]," but *Cannon* is easily distinguishable. Title IX of the Education Amendments of 1972, the statute at issue in *Cannon*, was "patterned after" Title VI of the Civil Rights Act of 1964, which had already been found to create a private remedy, and there was evidence of legislative intent to have Title IX operate the same way. *Id.* at 697-98. There is no such evidence of intent in this case. The absence of evidence and authority to the contrary indicates that Congress did not intend § 415(b) to create a private right of action on behalf of shareholders, and thus the second and most important *Cort* factor weighs against creating such a right.

The parties do not dispute that, whatever else Congress may have intended, the underlying purpose of the 1997 Act, as a whole, was to make Amtrak financially viable.

*See also Future of Amtrak and Rail Passenger Service: Hearing before the Comm. on House Transp. and Infrastructure*, 107th Cong. 2 (2002) (statement of Frank R. Goldstein, Partner, Sidley Austin Brown & Wood LLP, on behalf of now-plaintiff American Financial Group, Inc.) ("The obvious intent of the [1997 Act] was to require Amtrak to operate in a more efficient and business-like manner, so that it would be able to function, either as a private or quasi-private company, with substantially less federal government subsidization."). APU argues that finding § 415(b) to imply a private right of action would be consistent with this underlying purpose.

APU's strongest argument is that timely redemption of the stock shares under § 415(b) is required to fulfill the 1997 Act's purpose. Even Amtrak acknowledges that redemption would "rid Amtrak of certain . . . financial encumbrances so that [it] could position itself to seek and receive investor funds and other private financing." However, there is no reason to believe that redemption at a "fair" market value, as would be enforceable under an implied private right of action, would serve this goal any better than redemption at the "unfair" value of $0.03 per share that Amtrak offered. Furthermore, to the extent that Amtrak's dawdling frustrates Congress's intent to free up Amtrak to seek private financing, there is an exclusive   public enforcement mechanism in place to protect the Government's interest in a timely redemption: 49 U.S.C. § 24103(a)(1), which provides that the Attorney General may bring a civil action for equitable relief when Amtrak behaves inconsistently with its authorizing statute.

APU argues that implying a private right of action would "strengthen the guidance [and governmental oversight] brought to bear on Amtrak," but does not acknowledge that the additional "guidance" generated by a private right of action could easily be at cross-purposes with the underlying purpose of strengthening Amtrak (as here, for example, where the shareholders presumably want Amtrak to redeem the shares for as much as possible, while Amtrak would profit most by paying as little as possible). APU implicitly acknowledges the divergent interests when it argues that, absent a private right of action, it would be without remedy because the Attorney General "would be likely unwilling to file litigation when only four shareholders are adversely affected

by Amtrak's failure to comply with the Act's mandate." If the purpose of the 1997 Act is to strengthen Amtrak, and Amtrak itself is not adversely affected by its noncompliance, then how will a private right of action serve the 1997 Act's "underlying purpose?" It will not. Therefore, we find that a private right of action in § 415(b) would not be consistent with the underlying purposes of the legislative scheme of the 1997 Act.

Neither Amtrak nor APU disputes the district court's conclusion that "matters concerning Amtrak . . . are not traditionally relegated to state law . . . ." This factor does not weigh against APU.

Because three of the four *Cort* factors weigh against finding an implied private right of action in this case, including the most important factor of congressional intent, the district court did not err in finding that § 415(b) does not imply a private right of action on behalf of shareholders.

C.

Having concluded that § 415(b) does not create an implied right of action, we must still consider whether it creates a property interest protected by due process. U.S. Const. amend. XIV; *Bd. of Regents v. Roth*, 408 U.S. 564, 569-70 & n.7 (1972) (explaining that procedural due process entitles a person to a hearing before being deprived of a property interest).

A right of action is a "species of property," but not the only one. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)). "[T]he types of interests protected as 'property' are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.'" *Id.* at 430 (quoting *Nat'l Mut. Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 646 (1949) (Frankfurter, J., dissenting)). A property interest may be created by § 415(b) even in the absence of a private right of action. *See McClain v. Nw. Cmty. Corrs. Ctr. Judicial Corrs. Bd.*, 440 F.3d 320, 328-32 (6th Cir. 2006) (separately analyzing whether plaintiff has a private right of action and a protected property interest).

Amtrak cites *Hughlett v. Romer-Sensky*, 497 F.3d 557, 567 (6th Cir. 2006), for the proposition that "a statute that fails to confer a private right of action also necessarily fails to provide a protectable property interest for purposes of the Due Process Clause." However, unlike § 415(b), which involves an actual mandate, the regulations at issue in *Hughlett* were "'substantial compliance' provisions in Spending Clause legislation," i.e., conditions that the state government had to meet in order to qualify for federal funds, *see id.* at 564 (citation omitted), which the Supreme Court had already termed "simply a yardstick . . . to measure . . . performance of a State's . . . program," *Blessing v. Freestone*, 520 U.S. 329, 343 (1997). The regulations did not command the state to give plaintiffs anything, *see Printz v. United States*, 521 U.S. 898, 935 (1997) (holding that the federal government cannot conscript state officers to carry out federal law), but only set the bar for what the state would have to do to participate in a federal program, *see South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987). In such a case, the property interest analysis will certainly be "coterminous with that for a private right of action," but *Hughlett* should not be broadly generalized to cases involving actual mandates, such as that in § 415(b).

A statute creates a protected property interest when it "both confers [a] benefit and limits the discretion of the [government] to rescind the benefit." *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 410 (6th Cir. 2002). The question of whether a benefit was conferred is not merely a question of whether the law, in fact, caused some benefit to accrue to the plaintiff. For example, although a woman may benefit when police arrest her estranged husband for violating a restraining order, the statute mandating arrest does not confer a benefit on her so as to create a protected property interest. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005). The recipient "clearly must have more than an abstract need or desire for" the benefit and must have "more than a unilateral expectation of it." *Roth*, 408 U.S. at 577. Grants of a horse-trainer's license, utility services, disability benefits, a driver's license, and welfare benefits have all sufficed to meet the "benefit conferral" requirement. *See Logan*, 455 U.S. at 430-31 (collecting cases).

Even though Congress enacted § 415(b) for the benefit of Amtrak, the requirement that the redemption be for "fair market value" nonetheless confers a benefit on shareholders, including APU. A statute designed for the benefit of a class may confer benefits on those outside the class. For example, although licensing requirements are usually enacted for the benefit of the general public and not for the benefit of licensees, *see, e.g.*, *Tradewinds Envtl. Restoration, Inc. v. St. Tammany Park, LLC*, 578 F.3d 255, 259 (5th Cir. 2009) (stating that mold remediation licensing requirements "were expressly designed to protect the public"), the license is still a benefit conferred on the licensee. *See, e.g. Barry v. Barchi*, 443 U.S. 55, 64 (1979) (acknowledging that a horse trainer had a property interest in his trainer license). Likewise, requiring a fair-value redemption of APU's shares confers a benefit on APU, even though the redemption provision was not enacted primarily for the purpose of benefitting APU.

The second element of a property interest, a limit on the government's discretion to rescind the benefit, may be sufficient even if it leaves a considerable amount of discretion in the government's hands. For example, the Second Circuit appeared to approve of several district courts' holdings that the somewhat vague mandate to provide "each inmate [with] a program of education which . . . seems most likely to further the process of socialization" created a property interest in at least *some* education that was not "wholly unsuited" to socialization. *See Handberry v. Thompson*, 446 F.3d 335, 354 (2d Cir. 2006) (citations omitted). However, if the government has the discretion to rescind the benefit entirely, there is no property interest. *See EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 856-57 (6th Cir. 2012).

Section 415(b) clearly limits the government's discretion and thereby creates a protected property interest. The provision contains a deadline, October 1, 2002, and the requirement that redemption be for "fair market value." Although the latter requirement is not as precise as the deadline, it can be objectively substantiated and determined to either be met or not met. *See United States v. Abbey*, 560 F.3d 513, 523 (6th Cir. 2009) (rejecting the argument that "fair market value" is a subjective standard).

Even though § 415(b) does not imply a private right of action, it creates a protected property interest, on behalf of APU, in a fair-value redemption of Amtrak shares.  As the holder of a protected property interest, APU is entitled to some degree of process before being deprived of its interest. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (describing the three-factor standard for adequacy of process).  Because APU's due process claim seeks only equitable relief, *Meyer* is no obstacle.  The district court erred in dismissing this claim.

## D.

We do not address whether the statute of limitations should bar APU's due process claim (the only remaining claim).  The district court addressed this issue in a single paragraph, stating that "Plaintiffs' claims are not time-barred, inasmuch as they relate to the question of the value of the shares . . . ."  There was no need to do a thorough analysis on each claim, or even reach the issue at all, since the district court had dismissed all the claims on alternate grounds.  Now that we have narrowed the field to a single remaining claim and the statute of limitations question may be dispositive, we leave it to the district court to perform, in the first instance, a thorough analysis of whether APU's due process claim is, on its face, time-barred.

Because the remaining claims fail on other grounds, there is no need to reach the issue of whether they would have been barred by a statute of limitations or by the 1978 Settlement Agreement.

## III.

For the above reasons, we reverse the judgment as to APU's fourth claim, the claim that Amtrak's valuation of APU's shares denied APU due process in violation of the Due Process Clause of the Fifth Amendment. We remand this claim to the district court for proceedings consistent with this opinion.  We affirm the judgment as to the remaining claims.