**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

GEORGE GARRIDO, AKA Jorge
Arturo Garrido,
*Defendant-Appellant*.

No. 06-50717

D.C. No.
CR-04-01594-SVW-4

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

ALBERT T. ROBLES, AKA
Albert Tzareih Robles; Alberto
Del Tzareih,
*Defendant-Appellant*.

No. 06-50718

D.C. No.
CR-04-01594-SVW-1

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
November 15, 2010—Pasadena, California

Filed April 15, 2013

Before: Harry Pregerson, John T. Noonan,
and Richard A. Paez, Circuit Judges.

Opinion by Judge Pregerson

## SUMMARY[*]

### Criminal Law

The panel reversed Albert Robles's and George Garrido's honest services fraud convictions, reversed Robles's money laundering convictions, and affirmed Robles's bribery convictions in a case that arose out of events that took place while Robles was Treasurer of the City of South Gate, California.

Robles and Garrido, a local businessman and friend of Robles, were implicated in two schemes to award city contracts to particular companies while reaping substantial benefits for themselves.

The panel reversed Robles's 18 U.S.C. § 1346 honest services fraud convictions with respect to Counts 1 through 11, 13 through 15, 17, and 23 through 25, and Garrido's § 1346 honest services fraud conviction with respect to Counts 23 through 25 because, under *Skilling v. United States*, 130 S. Ct. 2896 (2010), the jury instructions

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

erroneously permitted convictions on the unconstitutional theory of a failure to disclose a conflict of interest.

The panel reversed Robles's § 1346 honest services fraud convictions with respect to Counts 16, 22, and 27 and Garrido's honest services fraud convictions with respect to Counts 22 and 27, and acquitted Robles on Counts 16, 22, and 27, and acquitted Garrido on Counts 22 and 27 because these counts are based on *Skilling*'s unconstitutional theory of a failure to disclose a conflict of interest in a state disclosure form, and because there is insufficient evidence to support Counts 16 and 27.

The panel reversed Robles's 18 U.S.C. § 1957 money laundering convictions with respect to Counts 18 through 21 because they are predicated on the flawed honest services fraud convictions.

The panel affirmed Robles's 18 U.S.C. § 666 bribery convictions with respect to Counts 33 through 37 because § 666 convictions do not require the defendant to be influenced in an official act.

---

### COUNSEL

Karen L. Landau, Oakland, California; Dennis P. Riordan, Riordan & Horgan, San Francisco, California, for Defendants-Appellants.

Elana Shavit Artson, Assistant United States Attorney, Los Angeles, California, for Plaintiff-Appellee.

---

**OPINION**

PREGERSON, Circuit Judge:

Albert T. Robles ("Robles") appeals his convictions for honest services mail and wire fraud (18 U.S.C. §§ 1341, 1343, 1346), money laundering (18 U.S.C. § 1957), and bribery (18 U.S.C. § 666). George Garrido ("Garrido") appeals his convictions for honest services mail fraud (18 U.S.C. §§ 1341, 1346). We have jurisdiction under 28 U.S.C. § 1291.

After Robles and Garrido were convicted and sentenced, and while their cases were on appeal, the Supreme Court in *Skilling v. United States*, 130 S. Ct. 2896 (2010), narrowed the scope of 18 U.S.C. § 1346 to include only honest services fraud based on bribery and kickback schemes. *Id*. at 2933. The Court prohibited prosecutions (such as those in this case) based on a *failure to disclose a conflict of interest* as unconstitutionally vague. *Id*. at 2932. In light of *Skilling*, we reverse Robles's and Garrido's honest services fraud convictions and reverse Robles's money laundering convictions. We affirm Robles's bribery convictions under 18 U.S.C. § 666 because such convictions do not require the defendant to be engaged in an official act. Accordingly, we remand for further proceedings consistent with this opinion.

**I.**

Following a jury trial, Robles was convicted of twenty-one counts of honest services mail and wire fraud (Counts 1–11, 13–17, 22–25, 27); four counts of money laundering (Counts 18–21); and five counts of bribery (Counts 33–37).

Garrido was convicted of five counts of honest services mail fraud (22–25, 27).

Robles's and Garrido's convictions arose out of a series of events that took place while Robles was Treasurer of the City of South Gate, California. Robles was elected Treasurer in 1997 and reelected in 2001. He had previously served as Mayor and as an elected member of the South Gate City Council. Garrido was a local businessman and friend of Robles's. Robles and Garrido were implicated in two schemes to award city contracts to particular companies while reaping substantial benefits for themselves.

## A. Sewer Repair and Housing Project Schemes (Counts 1–21)

The first scheme, charged against Robles alone, involved two corporate entities: the Southland Companies, comprised of several housing development corporations, and PSOMAS, an engineering consulting firm. The Southland Companies were developing housing projects in South Gate, and PSOMAS was interested in sewer repair contracts in South Gate.

The indictment alleged that Robles used his influence as Treasurer to induce the Southland Companies and PSOMAS into hiring Robles's friend Edward Espinoza ("Espinoza") as a consultant; directed the city council to award contracts to the two companies; and concealed or failed to disclose that

portions of the city's money paid to those companies was funneled to Robles and to Robles's friends and family.[1]

Counts 1 through 11 alleged that checks were mailed from the City of South Gate to PSOMAS and from PSOMAS to EM Ventures, a company that Espinoza owned and used to receive money from individuals and entities who did business with the City of South Gate. Counts 13 through 15 and 17 charged that wire transfers were made from three Southland housing development projects to Espinoza, EM Ventures, and ETE & Associates, a financial advisory firm that Espinoza owned and used to receive money from individuals and entities who did business with the City of South Gate.

Count 16 specifically alleged that Robles failed to disclose in a 2002 California Form 700, Statement of Economic Interests, that he received from Espinoza a $65,000 platinum membership in the Anthony Robbins Foundation, a self-help motivational organization, and that Robles caused that Form 700 "to be transmitted in interstate commerce by wire communications" by faxing it to Sacramento.[2]

---

[1] The indictment alleged that the Southland Companies and PSOMAS paid over $2 million from city contracts to Espinoza or his companies. Espinoza in turn was alleged to have paid over $1.4 million to Robles's family and friends.

[2] In 2002, elected officials in California had a duty to disclose the source of gifts in excess of $50 on Form 700. *See* Cal. Gov't Code § 89503 (f) (providing that the gift limit is adjusted every odd-numbered year). A "gift" is "any payment that confers a personal benefit on the recipient, to the extent that consideration of equal or greater value is not received . . . ." *Id*. § 82028(a). A "gift" does not include campaign contributions. *Id*. § 82028(b)(4). "Contribution" is defined as "a payment . . . except to the extent that full and adequate consideration is received, unless it is clear from the surrounding circumstances that it is not made for political

Counts 18 through 21 charged Robles under 18 U.S.C. § 1957 with money laundering. Those counts alleged that Robles used the money gained from the honest services fraud to purchase property in Mexico and for a platinum membership in the Anthony Robbins Foundation.

## B. Waste-Hauling Contract Scheme (Counts 22–37)

The second scheme, charged against both Robles and Garrido, alleged that Robles, while he was Treasurer, caused the City of South Gate to award improperly a waste-hauling contract to Michael Klistoff's ("Klistoff") waste company, Klistoff & Sons.

Garrido and Klistoff had been friends for several years before Garrido introduced Klistoff to Robles. In 1999, at Robles's request, Klistoff began making campaign contributions and gifts[3] to Robles and Robles's general

---

purposes." *Id*. § 82015(a). A payment "made at the behest of a candidate is a contribution to the candidate unless . . . [i]t is clear from the surrounding circumstances that the payment was made for purposes unrelated to his or her candidacy for elective office." *Id*. § 82015(b)(2)(B). One type of payment that is presumed to be for purposes unrelated to a candidate's candidacy for elective office is a payment "made principally for personal purposes," which "may be considered a gift." *Id*. § 82015(b)(2)(B)(I).

[3] In January 2000, Klistoff bought a personal computer and computer software for Robles. In October and November 2000, Klistoff wrote two checks to Pyramid Press for Citizens for Good Government. Also in November 2000, Klistoff made a partial payment for a telephone switchboard system for Robles. In February 2001, Klistoff paid for copying expenses for Robles. Klistoff made all of these payments at Robles's request.

purpose committee, Citizens for Good Government.[4] Klistoff agreed to make these contributions because he knew Robles had influence in South Gate and Klistoff was hoping to gain access to future waste-hauling contracts.

About ten days before the March 2001 election, Robles asked the then-current waste-hauling company for South Gate, Waste Management, whose contract with the city was set to expire in eight months, to pay $15,000 worth of printing bills that Robles was about to incur. Waste Management declined to pay the bills because it was too late to report them as a campaign contribution. After Robles was reelected Treasurer, Robles told Waste Management that they were not his friends and that, as far as Robles was concerned, Waste Management was "out of town." Robles told Waste Management to go away quietly or he would hurt the company in other cities.

In 2001, Klistoff told Garrido that he wanted Klistoff & Sons to be awarded South Gate's ten-year waste-hauling contract, worth about $48 million. Garrido agreed to help Klistoff get the contract on the conditions that: (1) Klistoff hired Garrido as a consultant for $350,000 per year for the duration of the ten-year waste-hauling contract, and (2) Garrido's recycling business would be cut in on the contract if it was awarded to Klistoff & Sons.

---

[4] A general purpose committee is a committee that: (1) receives contributions totaling $1,000 or more in a calendar year, and is "formed or exists primarily to support or oppose more than one candidate or ballot measure"; (2) makes independent expenditures of more than $1,000 per calendar year; or (3) makes contributions totaling $10,000 in a calendar year at the behest of candidates or committees. Cal. Gov't Code §§ 82027.5, 82013(a)–(c).

Robles met with Klistoff before South Gate sent out its request for proposals for the waste-hauling contract. Robles showed Klistoff the draft request for proposals, which called for one company to perform residential services and three companies to perform commercial waste-hauling services. Klistoff suggested to Robles that one company could perform both waste-hauling services. The final request for proposals incorporated Klistoff's suggestion and called for a single company to perform both the residential and commercial services. Klistoff & Sons submitted its bid for the waste-hauling contract in June 2001.

In July 2001, Robles assigned his friend, Louis Moret, to work on the city's waste-hauling contract as the facilitator for the bidding process. Moret presented the staff recommendation for the contract to the city council and attended the meeting when the city council voted to award the contract. Robles told Moret that "he had a horse in the race" and that horse was Klistoff & Sons. Robles was concerned about Klistoff's ability to make a persuasive presentation to the contract selection committee, so he asked Moret to recommend a consultant to help Klistoff & Sons prepare its oral presentation in support of its bid. Moret recommended Ray Garubo ("Garubo") as a consultant. Shortly thereafter, Garrido contacted Klistoff and advised him to hire Garubo as a consultant to help Klistoff & Sons make an effective and convincing presentation to city officials. Klistoff retained Garubo as a consultant, but Garrido paid Garubo's consulting fees.[5]

---

[5] Advising Klistoff to retain Garubo and paying Garubo's consultant fees were the only services Garrido provided Klistoff even though Klistoff agreed to pay Garrido $350,000 per year for the life of the ten-year waste-hauling contract. Between 2002 and 2003, Klistoff made five payments

Klistoff received information that no competing company was given. Robles showed Klistoff the other competing companies' bids, even though the bids were supposed to be confidential. Moreover, at Robles's request, Moret provided Robles and Garubo with a copy of the confidential questions that the selection committee would ask the bidders to answer during oral presentations. None of the other bidders were provided with these confidential questions in advance of their oral presentations.

After the oral presentations, the selection committee voted to recommend that South Gate engage in exclusive negotiations with Klistoff & Sons. The vote was in part based on Klistoff's oral presentation. The city council approved the selection committee's recommendation and ultimately awarded the $48 million waste-hauling contract to Klistoff & Sons.

Counts 22 through 25 and 27 charged Robles and Garrido with honest services mail fraud in connection with the waste-hauling contract scheme. Count 22 is based on California Form 700, Statement of Economic Interests, for calendar year 2000 in which Robles failed to disclose the payments received from Klistoff for a computer, software, and a telephone switchboard system. *See supra* note 3. The Form 700 was mailed. Counts 23 through 25 are based on three checks from Garrido's business, GWS Nursery and Supplies, Inc., received by Garubo for assisting Klistoff & Sons in its efforts to obtain the waste-hauling contract with South Gate.

---

to Garrido of $87,500 each, for a total of $437,500. Klistoff did not make any further payments to Garrido.

Count 27 refers to a California Form 700, Statement of Economic Interests, for calendar year 2001, in which Robles failed to disclose copying services paid for by Klistoff on Robles's behalf.

Counts 33 through 37 were charged against Robles alone. Robles was charged under 18 U.S.C. § 666 with accepting bribes from Klistoff in connection with the waste-hauling contract.

### C. Indictment and Trial

The government filed the original indictment against Robles, Klistoff, and Espinoza in November 2004. It filed a First Superseding Indictment in December 2004, alleging forty counts against those same defendants. On March 10, 2005, Espinoza pled guilty to four counts of the First Superseding Indictment. On March 24, 2005, the government filed the Second Superseding Indictment against Robles, Klistoff, and Garrido. In June 2005, after Klistoff entered into a plea agreement, the government filed a redacted Second Superseding Indictment which deleted Klistoff as a named defendant in the caption. The redacted Second Superseding Indictment charged Robles with twenty-one counts of honest services mail and wire fraud, four counts of money laundering, and five counts of bribery. Garrido was charged with five counts of honest services mail fraud.

A jury convicted Robles and Garrido on all counts alleged in the redacted Second Superseding Indictment. The district court sentenced Robles to ten years in prison, fines, and restitution. Garrido was sentenced to fifty-one months in prison, fines, and restitution. Robles and Garrido timely appealed.

## II.

### A. Robles's and Garrido's 18 U.S.C. § 1346 Honest Services Fraud Convictions

Robles was convicted of honest services mail and wire fraud on Counts 1 through 11, 13 through 17, 22 through 25, and 27.  Garrido was convicted of honest services mail fraud on Counts 22 through 25, and 27.  Honest services mail and wire fraud cases "rel[y] on the idea that 'a public official acts as trustee for the citizens and the State . . . and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty to them.'"[6]  *United States v. Kincaid-Chauncey*, 556 F.3d 923, 939 (9th Cir. 2009) (quoting *United States v. Silvano*, 812 F.2d 754, 759 (1st Cir. 1987)).

#### 1. Honest Services Fraud Before and After *Skilling*

Before 1987, the government prosecuted honest services fraud cases under 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).  *United States v. Weyhrauch*, 548 F.3d 1237, 1243 (9th Cir. 2008), *vacated and remanded on other grounds*, 130 S. Ct. 2971 (2010); *United States v. Bruno*, 809 F.2d 1097, 1099, 1104–05 (5th Cir. 1987).  Sections 1341

---

[6] The indictment alleged that South Gate's public officials' "duty of honest services included the following obligations: (a) to act as trustees for the citizens, and in the best interests of the public, without pursuing their own personal interests; (b) to conduct election campaigning and fund-raising activities openly and free from fraud and dishonesty; (c) to refrain from taking official action on any matter in which they might have a direct or indirect financial interest without first disclosing any such interest to the public; and (d) to abide by the laws of the United States, the laws of the State of California, and the laws of the City of South Gate."

and 1343 "criminalize the use of the mails or wires in furtherance of 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *Skilling v. United States*, 130 S. Ct. 2896, 2908 n.1 (2010) (quoting §§ 1341 and 1343).

Although those statutes prohibit the use of the mails or wire services to perpetrate fraudulent schemes to deprive others of "money or property," our court and other courts interpreted the statutes to apply to the deprivation of the public's "intangible rights" to public officials' honest services. *United States v. Milovanovic*, 678 F.3d 713, 720 (9th Cir. 2012) (en banc); *Weyhrauch*, 548 F.3d at 1243; *see also Bruno*, 809 F.2d at 1105 (stating citizens "may be defrauded of nonpecuniary interests" such as the "honest services of [their] public officials"); *United States v. Gray*, 790 F.2d 1290, 1295 (6th Cir. 1986) (explaining "the 'intangible rights' theory is anchored upon the defendant's misuse of his public office for personal profit"); *United States v. Keane*, 522 F.2d 534, 549 (7th Cir. 1975) (noting "the mail fraud statute in this circuit has been used . . . to prosecute public officials for . . . depriving their constituents of their right to loyal, faithful and honest public service"); *United States v. States*, 488 F.2d 761, 765 (8th Cir. 1973) (holding a fraudulent scheme may "deceive and defraud the public . . . of certain intangible political and civil rights").

In 1987, however, the Supreme Court held that § 1341 was limited to protecting property rights, and suggested that "[i]f Congress desires to go further, it must speak more clearly than it has." *McNally v. United States*, 483 U.S. 350, 360 (1987). Congress responded by inserting § 1346 into the federal criminal code the following year. *Skilling*, 130 S. Ct.

at 2927; *see also* Act of Nov. 18, 1988, Pub. L. 100-690, 102 Stat. 4181, 4508 (1988) (codified at 18 U.S.C. § 1346). By enacting § 1346, Congress "meant to reinstate the body of pre-*McNally* honest services law." *Skilling*, 130 S. Ct. at 2929 (citation and internal quotation marks omitted). Section 1346 "defines the term 'scheme or artifice to defraud'" for the purposes of honest services mail and wire fraud "to include 'a scheme or artifice to deprive another of the intangible right of honest services.'" *Id.* at 2908 n.1 (quoting § 1346).

Following the enactment of § 1346, courts around the country interpreted the statute to encompass various types of schemes and to make criminal a wide variety of acts. *See, e.g.*, *Weyhrauch*, 548 F.3d 1243–44 (listing cases); *United States v. Walker*, 490 F.3d 1282, 1297 (11th Cir. 2007) (noting that "[t]he scope of conduct covered by the honest services mail fraud statute is extremely broad"). *But see United States v. Brumley*, 116 F.3d 728, 734 (5th Cir. 1997) (holding violation of § 1346 requires that "a state official breached a duty respecting the provision of services owed to the official's employer under state law"). The Ninth Circuit recognized two theories of honest services fraud: (1) bribery and (2) failure to disclose a material conflict of interest. *Kincaid-Chauncey*, 556 F.3d at 942. The prosecution of Robles and Garrido proceeded under that framework.

After Robles's and Garrido's trial, the Supreme Court granted certiorari in the Fifth Circuit case *United States v. Skilling*, 554 F.3d 529 (5th Cir 2009), to determine whether a public official may be convicted of honest services fraud for failing to disclose material information. *See Skilling v. United States*, 130 S. Ct. 393 (2009).

In deciding *Skilling*, the Supreme Court limited the reach of § 1346. The Court held that § 1346 criminalizes *only* bribery and kickback schemes, *not* failures to disclose a conflict of interest. *Skilling*, 130 S. Ct. at 2933. Thus, by limiting § 1346 to bribery and kickback schemes, and prohibiting § 1346 prosecutions based on a failure to disclose a conflict of interest, *Skilling* changed the applicable analysis that applies to the present appeal.[7] The question after *Skilling* is whether Robles and Garrido were indicted, tried, and convicted of honest services fraud based on a proper bribery or kickback theory, or whether they were indicted, tried, and convicted on the unconstitutional undisclosed conflict of interest theory.

## 2.  The Impact of *Skilling*

On appeal, the parties have submitted changing arguments as to whether Robles and Garrido were charged with schemes involving bribery and kickbacks or involving undisclosed conflicts of interest. Before *Skilling*, Robles and Garrido argued that the government's case was founded *only* on a bribery theory, and that the government's evidence was insufficient to support their convictions. The government disagreed, insisting that its case was rooted in Robles's failure to disclose a conflict of interest. In support of its contention, the government highlighted the district court's finding that the indictment, viewed as a whole, alleged a scheme based on an undisclosed conflict of interest.

---

[7] Following the Supreme Court's decision in *Skilling*, the parties filed supplemental briefs addressing the impact of that case on the issues raised in this appeal.

After *Skilling*, however, the parties traded positions. Robles and Garrido now argue that the indictment, and the convictions resulting from it, alleged only a failure to disclose a conflict of interest. On the other hand, the government now argues that the indictment is based on bribery and kickbacks. The government also argues that the district court's instructions on the failure to disclose theory, while erroneous, did not affect Robles's and Garrido's substantial rights because the schemes alleged in the indictment "involved both bribes and kickbacks."

### 3. Standard of Review

"[C]onstitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory." *Skilling*, 130 S. Ct. at 2934 (citing *Yates v. United States*, 354 U.S. 298 (1957)). "Any omission or misstatement of an element of an offense in the jury instructions is constitutional error and, therefore, requires reversal unless we find the error 'harmless beyond a reasonable doubt.'" *United States v. Kilbride*, 584 F.3d 1240, 1247 (9th Cir. 2009) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Where there was no objection at trial, however, we review jury instructions for plain error. *Id.* "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b). "To notice error under Rule 52(b), we must find that (1) there is 'error'; (2) it was 'plain'; and (3) the error affected 'substantial rights.'" *United States v. Recio*, 371 F.3d 1093, 1100 (9th Cir. 2004) (quoting *United States v. Olano*, 507 U.S. 725, 732–35 (1993)). Even if these three conditions are met, the court may reverse the district court only if the error "'seriously affects the fairness,

integrity or public reputation of judicial proceedings.'" *Id.* (quoting *Olano*, 507 U.S. at 736).

### 4. The Jury Instructions on Undisclosed Conflicts of Interest were Erroneous and the Error was Plain

The parties agree that the first two prongs of the plain error test are satisfied. An error is plain if it is clearly inconsistent with established law at the time of appellate consideration. *Johnson v. United States*, 520 U.S. 461, 468 (1997); *see also Henderson v. United States*, 133 S. Ct. 1121, 1130 (2013) (holding "whether a legal question was settled or unsettled at the time of trial, 'it is enough that an error be 'plain' at the time of appellate consideration.'" (quoting *Johnson*, 520 U.S. at 468)).

The court instructed the jury on the mail and wire fraud counts as follows:

> In order for defendants Robles and Garrido to be found guilty of [mail or wire fraud], the government must prove each of the following four elements beyond a reasonable doubt:
>
> First, the defendant knowingly made up or participated in a scheme or plan to deprive the City of South Gate and its citizens of their right to the honest services of their elected officials . . . . Secondly, the defendant acted with the intent to defraud, that is, the intent to deprive the City of South Gate and its citizens of their right to the honest services of their elected officials . . . . Third, the defendant

used a material falsehood or omitted material information . . . . Fourth, the defendant used, or caused someone to use, the mails [or a wire communication] in interstate commerce to carry out or attempt to carry out the scheme or plan.

Trial Tr. 1922–1925, July 26, 2005.

The court defined the intent to defraud the public of honest services as follows:

Public officials and public employees inherently owe a duty to the public to act in the public's best interest. If, instead, the official acts or makes his decision based on the official's own personal interests, such as accepting a bribe, taking a kickback, *or receiving a benefit from an undisclosed conflict of interest*, the official has defrauded the public of the official's honest services even though the city may not suffer any monetary loss in the transaction.

Trial Tr. 1925–26, July 26, 2005 (emphasis added).

Thus, the jury instructions improperly allowed a conviction where "the official acts or makes his decision based on the official's own personal interests, such as accepting a bribe, taking a kickback, or receiving a benefit from an *undisclosed conflict of interest* . . . ." Trial Tr. 1925, July 26, 2005 (emphasis added). Because the district court's instructions permitted the jury to convict Robles and Garrido

on *Skilling*'s now unconstitutional failure to disclose theory, there was error and the error was plain.

### 5. The Error Affected the Appellants' Substantial Rights

An error affects substantial rights if there is "a reasonable probability that the error affected the outcome of the trial." *United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010). To determine if the error affected the outcome of the trial, "we consider 'all circumstances at trial including the strength of the evidence against [the] defendant.'" *United States v. Chambers*, 918 F.2d 1455, 1459 (9th Cir. 1990) (alteration in original) (quoting *United States v. Wagner*, 834 F.2d 1474, 1485 (9th Cir. 1987)). We "review the jury instructions as a whole," not only the erroneous instructions. *Kincaid-Chauncey*, 556 F.3d at 946. We may also examine the arguments made by the parties. *See Chapman*, 386 U.S. at 25 (noting that the prosecutor's argument repeatedly relied on an error of law).

After reviewing the trial record as a whole, we conclude that there is a reasonable probability that the jury convicted Robles and Garrido of honest services fraud based on their failure to disclose a conflict of interest. Because of the emphasis on the conflict of interest theory in the jury instructions and in the closing arguments, we find that the error affected the Appellants' substantial rights.

### a. *The Indictment*

We find the indictment ambiguous at best. It arguably encompasses both theories of honest services fraud: (1) bribery and kickbacks, and (2) a failure to disclose a conflict of interest. The vast majority of the allegations appear to support only an undisclosed conflict of interest.[8] Nevertheless, because the indictment could be read to at least imply a bribery or kickback scheme, it is not possible to conclude on the basis of the indictment alone which theory or theories the jury may have embraced in rendering a guilty verdict on the § 1346 honest services charges.

### b. *The Jury Instructions*

The district court's § 1346 jury instructions included only a single reference to bribery and kickbacks in its example of schemes that could amount to honest services fraud ("accepting a bribe, taking a kickback, or receiving a benefit from an undisclosed conflict of interest"). The overwhelming weight of the instructions support only the undisclosed conflict of interest theory, rather than a bribery or kickback theory. The transcript of the jury instructions devoted nine

---

[8] The indictment lists several state and local disclosure laws pertaining to public officials. It also alleges schemes involving failures to disclose various conflicts of interest, including Robles's failure to disclose at least $65,000 in financial benefits (i.e. a platinum membership in the Anthony Robbins Foundation) that he received from Espinoza; Robles's failure to disclose to the city council the financial benefit he and his friends and family would receive from the Southland Companies and PSOMAS city contracts; Robles's failure to disclose the financial benefit his friend Garrido would receive from the contract granted by the city to Klistoff & Sons; and Robles's failure to report Klistoff's access to the confidential interview questions and confidential bids.

pages to state and local laws governing a public official's duty to disclose various contributions, gifts, and conflicts of interest.

In contrast to the detailed discussion of the failure to disclose theory, the district court did not define either "bribery" or "kickback" in the § 1346 context. Although bribery was defined in the 18 U.S.C. § 666 jury instructions, § 666 does not require a jury to find a specific *quid pro quo*. *See United States v. McNair*, 605 F.3d 1152, 1187–89 (11th Cir. 2010) (concluding that § 666 does not require a specific *quid pro quo*); *see also id.* at 1189 (collecting cases from other circuits which hold that § 666 does not require a *quid pro quo*).**[9]** A *quid pro quo* in bribery is the "specific intent to

---

**[9]** *McNair* lists the following cases in support of its holding that § 666 does not require a *quid pro quo*:

> *United States v. Abbey*, 560 F.3d 513, 520 (6th Cir.), *cert. denied*, 130 S. Ct. 739, 175 L. Ed. 2d 520 (2009) (stating "the text says nothing of a quid pro quo requirement to sustain a conviction" and "while a *quid pro quo* of money for a specific legislative act is sufficient to violate [§ 666(a)(1)(B) or (a)(2)], it is not necessary") (quotation marks omitted); *United States v. Gee*, 432 F.3d 713, 714-15 (7th Cir. 2005) (holding that "[a] *quid pro quo* of money for a specific legislative act" is not necessary under § 666(a)(1)(B) and that an exchange of money for the official's "influence" was enough); *United States v. Agostino*, 132 F.3d 1183, 1190 (7th Cir. 1997) ("We decline to import an additional, specific *quid pro quo* requirement into the elements of § 666(a)(2)."); *but see United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) (concluding the "corrupt intent" element in § 666 requires the government to prove a *quid pro quo*, but stating the "*quid pro quo* requirement is satisfied so

give or receive something of value *in exchange* for an official act." *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404–05 (1999). Section 1346 honest services convictions on a bribery theory, on the other hand, require at least an implied *quid pro quo*.[10] *Kincaid-Chauncey*, 556 F.3d at 943; *see* Section III.A. below for further discussion.

There is evidence in the record that could support a bribery or kickback conviction. Appellants do not dispute that payments and in-kind contributions were made to Robles's family and friends, including Garrido. For example,

_____

> long as the evidence shows a 'course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor'" and "the intended exchange in bribery can be 'this for these' or 'these for these,' not just 'this for that'" (citations omitted).

*McNair*, 605 F.3d at 1189 (alterations in original).

[10] Robles was convicted on a separate substantive count of bribery in violation of 18 U.S.C. § 666. However, proving bribery under § 666 does not necessarily prove bribery under § 1346 honest services fraud because the government must prove at least an implied *quid pro quo* to prove bribery under § 1346, but the government does not need to prove a *quid pro quo* under § 666 bribery. Thus, if the government did not prove a *quid pro quo*, the jury could not have convicted Robles of bribery under § 1346 honest services fraud, but the jury could still have convicted Robles of bribery under § 666. Therefore, we cannot extrapolate from Robles's § 666 bribery conviction that the jury convicted Robles of § 1346 honest services fraud on a *bribery* theory (as opposed to an undisclosed conflict of interest theory). *Cf. United States v. Wilkes*, 662 F.3d 524, 544 (9th Cir. 2011) (holding that the jury's conviction of Wilkes on a separate substantive count of bribery under another statute, 18 U.S.C. § 201, "confirms beyond any reasonable doubt that the jury would have convicted" Wilkes under § 1346 honest services fraud on a *bribery* theory because § 201, like § 1346 bribery, requires proof of a *quid pro quo*).

Espinoza testified that Robles instructed him to funnel well over half of the proceeds of his city contract to Robles's sister-in-law.  Nevertheless, it is impossible to conclude that the jury convicted Robles and Garrido based on their participation in either a bribery or a kickback scheme instead of based on *Skilling*'s unconstitutional failure to disclose a conflict of interest.

### c.   The Closing Arguments

The prosecutor's closing argument leaves little doubt that its case focused almost entirely on a failure to disclose theory. The prosecutor repeatedly invoked the public's right to know when its public officials stand to benefit from expenditures of public funds.  Although the prosecutor referred to financial arrangements between Robles and certain contractors (e.g. the Southland Companies, PSOMAS, and Klistoff & Sons), the prosecutor did not argue that they were the building blocks of a bribery or kickback scheme.  Rather, such financial arrangements were consistently offered to show that Robles had conflicts of interest which were never disclosed to the voters or to other officials of the City of South Gate.  Thus, the prosecutor's closing argument strongly suggests that the case was presented to the jury as a failure to disclose a conflict of interest, which is precisely what the Supreme Court found unconstitutional in *Skilling*.

Similarly, the transcript from Robles's closing argument suggests he believed he was fighting undisclosed conflict of interest charges.  His closing argument focused almost entirely on whether he had a duty to disclose the payments, whether the payments fell within the ambit of state or local conflict of interest provisions, and whether the payments were political "contributions" (which were not required to be

disclosed on Robles's personal conflict of interest Form 700) or whether they were "gifts" (which had to be disclosed).

The indictment, the jury instructions, and the closing arguments at trial were permeated with the prohibited failure to disclose theory. Upholding the convictions where neither the government nor the Appellants argued their cases on a constitutionally valid theory constitutes a miscarriage of justice which would "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." *Marcus*, 130 S. Ct. at 2164. Thus, Appellants have met their burden under the plain error standard of review to show that there was a reasonable probability that the instructional error affected the outcome of the trial and that the error seriously affected the fairness, integrity or public reputation of judicial proceedings.

Therefore, we reverse Robles's honest services mail and wire fraud convictions and reverse Garrido's honest services mail fraud convictions. Furthermore, Counts 16, 22, and 27 fail for additional reasons, which we turn to now.

**B. Robles's § 1346 Honest Services Conviction on Count 16 and Robles's and Garrido's § 1346 Honest Services Convictions on Counts 22 and 27**

Robles's § 1346 conviction on Count 16 and Robles's and Garrido's § 1346 convictions on Counts 22 and 27 were each based on a failure to disclose a conflict of interest in a California Form 700, Statement of Economic Interests, disclosure form. Pursuant to *Skilling*, failure to disclose a conflict of interest in a state disclosure form cannot support a § 1346 honest services conviction. *See* Section II.A. above.

Moreover, as the government concedes, there is insufficient evidence to support the convictions on Counts 16 and 27 under any theory. Count 16 alleged that Robles failed to disclose that he received from Espinoza a $65,000 platinum membership in the Anthony Robbins Foundation. Purely intrastate telephone calls fall outside the reach of wire fraud under § 1343. *United States v. Izydore*, 167 F.3d 213, 219–20 (5th Cir. 1999). Because the form was faxed from South Gate, California to Sacramento, California, the government concedes that we should reverse Robles's conviction on Count 16 because the government never proved that the form traveled in interstate commerce.

Count 27 refers to a California Form 700 signed by Robles on April 2, 2002 for calendar year 2001, in which Robles failed to disclose a gift of copying services received from Klistoff. The government also concedes that we should reverse the Count 27 conviction because there was insufficient evidence that the copying services were gifts.

Because these convictions cannot be upheld post-*Skilling*, we reverse Robles's conviction on Count 16 and Robles's and Garrido's convictions on Counts 22 and 27.

## C. Robles's § 1957 Money Laundering Convictions

Because we reverse Robles's § 1346 honest services mail and wire fraud convictions, his convictions on Counts 18 through 21 for money laundering under 18 U.S.C. § 1957 must also be reversed. Convictions under § 1957 require the government to prove that the offender "engage[d] or attempt[ed] to engage in a monetary transaction in criminally derived property . . . derived from specified unlawful activity." 18 U.S.C. § 1957(a). The indictment alleged that

the "criminally derived property" was money derived from Robles's honest services fraud. Accordingly, because the § 1346 honest services convictions were constitutionally defective under *Skilling*, so too were the § 1957 convictions.

## III.

### A. Robles's 18 U.S.C. § 666 Bribery Convictions (Counts 33–37)

Counts 33 through 37 charged Robles alone with bribery in violation of 18 U.S.C. § 666 in connection with the waste-hauling contract.[11] Robles contends that § 666 requires a *quid pro quo*—a specific intent to receive a bribe in exchange for an official act. Robles argues that there was insufficient evidence to convict him of bribery under § 666 because there is no evidence that he intended to be, or even could have been, influenced in his performance of one of his *official* duties. Robles claims that, as Treasurer of South Gate, he did not have the authority to approve the waste-hauling contract; rather that authority was vested in the city council. Moreover, as Treasurer, he was required to disburse monies properly approved by the city.[12]

---

[11] The Indictment charged Robles with "corruptly accept[ing] and agree[ing] to accept . . . payments for goods and services and campaign contributions from Michael Klistoff and All City Services, intending to be influenced and rewarded in connection with a transaction of [a local government] . . . namely, the awarding of a multiple-year refuse collection and recycling contract in South Gate worth approximately $48 million."

[12] The South Gate Municipal Code provides that "[t]he primary function of the city treasurer is to disburse monies on demand which have been properly audited and approved, such that once the proper procedures have been followed, *the duty of the city treasurer to disburse the funds is*

"'Claims of insufficient evidence are reviewed de novo.'" *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) (quoting *United States v. Shipsey*, 363 F.3d 962, 971 n.8 (9th Cir. 2004)).  There is sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Section 666 concerns bribery in connection with state and local entities receiving federal funds.  An official violates § 666 if the official "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions" of an entity (in this case, the City of South Gate), if the exchange involves at least $5,000 and the entity receives federal funds in excess of $10,000.  18 U.S.C. § 666(a)(1)(B), (b).  The purpose of the statute is to "protect federal funds by preserving the integrity of the entities that receive the federal funds." *United States v. Simas*, 937 F.2d 459, 463 (9th Cir. 1991) (citing *United States v. Westmoreland*, 841 F.2d 572, 578 (5th Cir. 1988)).

Robles's argument that § 666 requires an official act "confuses influence with [the] power to act unilaterally." *United States v. Gee*, 432 F.3d 713, 715 (7th Cir. 2005).  A jury could reasonably find that Robles intended to be

---

*mandatory and not discretionary*."    South Gate Municipal Code § 1.05.050(A) (emphasis added).  The treasurer is also responsible for receiving cash receipts and depositing them into the appropriate city account. *Id.* at § 1.05.050(B).  This duty is not a "policy decision," but is instead "administrative and ministerial." *Id.*

influenced in connection with the city's award of the waste-hauling contract even though the authority to award the contract was not part of Robles's official duties.  The government presented evidence that Robles showed Klistoff a draft request for proposals for the contract, and that the final request for proposals incorporated Klistoff's suggestion that the waste-hauling contract award one company both residential and commercial waste-hauling services.  Robles assigned his friend Moret to work as facilitator for the bidding process for the waste-hauling contract.  Robles further instructed Moret that his "horse in the race" was Klistoff & Sons.  During the selection process, Robles communicated with Moret frequently and Moret told Robles information that was not available to the public.  Robles requested that Moret recommend a consultant to assist Klistoff & Sons in its presentation for the bid, but he did not request assistance for any other bidders.  Klistoff & Sons hired the recommended consultant.  Robles showed Klistoff the other companies' competing bids, even though the information was confidential during the bidding process.  Moret provided Robles and Klistoff & Son's consultant the confidential questions the selection committee would ask the bidders in advance of the presentations, an advantage no other bidder received.  Thus, there was ample evidence that Robles accepted bribes from Klistoff with the intention to be influenced in connection with the waste-hauling contract.  Robles indeed used his considerable influence exclusively for Klistoff's benefit.  Klistoff & Sons was awarded the contract despite not being the lowest bidder.

In support of his argument that § 666 requires the government to prove that Robles intended to be influenced in connection with an official act as treasurer, Robles urges the court to adopt the standards articulated in *United States v.*

*Sun-Diamond Growers of California*, 526 U.S. 398 (1999). We find *Sun-Diamond* inapposite. *Sun-Diamond* concerned a separate federal statute, 18 U.S.C. § 201, and the reasoning for requiring an official act under § 201 is inapplicable to § 666. Section 201(b) defines bribery as the act of giving, offering, or promising something of value in order "to influence any official act" or receiving something of value in return for "being influenced in the performance of any official act." 18 U.S.C. § 201(b)(1)(A), (2)(A); *Sun-Diamond*, 526 U.S. at 404. The term "official act" is expressly and broadly defined in § 201 as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). Bribery under § 201(b), therefore, expressly requires "a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act." *Sun-Diamond*, 526 U.S. at 404–05.

Importantly, *Sun-Diamond* was primarily concerned with limiting the scope of illegal gratuities under § 201(c). *Id.* at 405–14. Because § 201(c) criminalizes the giving of "anything of value," with no threshold monetary requirement, underlying *Sun-Diamond* was a need to distinguish between illegal gratuities and "token gifts" given "by reason of the recipient's mere tenure in office." *Id.* at 406, 408. Thus, requiring an official act under § 201(c) was necessary because "a contrary holding would criminalize a wide array of presumptively legal gift giving, like giving officials a hat or a hot dog." *United States v. Abbey*, 560 F.3d 513, 521 (6th Cir. 2009) (discussing the reasoning in *Sun-Diamond*). Under § 201(c), an official act is therefore the "limiting principle"

that distinguishes "an illegal gratuity from a legal one."
*United States v. Ganim*, 510 F.3d 134, 146 (2d Cir. 2007).

Section 666, on the other hand, makes no mention of an
"official act" or a requirement that anything be given in
exchange or return for an official act.  Section 666 does not
define or even use the term "official act."  Section 666
"sweeps more broadly than either §§ 201(b) or (c)."  *McNair*,
605 F.3d at 1191.  Because the plain language of § 666 does
not use the term "official act," we must not insert that term
into our reading of the statute.  *Id*. at 1192 (noting that
defendants failed "to show that the statutory language
criminalizes innocent behavior").  Moreover, the need for a
"limiting principle" to distinguish between illegal and legal
gratuities, as expressed in *Sun-Diamond*, is "not relevant [to
violations of § 666] because § 666 contains both a corrupt
intent requirement and a requirement that the illegal gift or
bribe be worth over $5,000."  *Abbey*, 560 F.3d at 521.  Thus,
we decline to adopt § 201's official act requirement for § 666.

In so holding, we join our sister circuits, the Third, Sixth,
Seventh, and Eleventh Circuits, who have all held § 666 does
not require that a bribe be given or received with the intent to
influence the public official in an official act.[13]  *See United*

---

[13] Robles cites to several cases from the Second Circuit in support of his
argument that § 666 requires a *quid pro quo*, an exchange for a specific
official act.  Most of our sister circuits, however, have rejected the
argument that § 666 requires a *quid pro quo*.  *See McNair*, 605 F.3d at
1187–88; *Abbey*, 560 F.3d at 520–21; *Gee*, 432 F.3d at 714–15; *see also
United States v. Boender*, 649 F.3d 650, 654 (7th Cir. 2011) (noting that
the Seventh Circuit "like most others, does not require a specific *quid pro
quo*" under § 666); *supra* n.9.  Moreover, it is possible for a court to
require a *quid pro quo* but not require that the exchange be for a specific
official act.  *See United States v. Redzic*, 627 F.3d 683, 692 (8th Cir. 2010)

*States v. Andrews*, 681 F.3d 509, 529-530 (3d Cir. 2012) (holding that for a conviction under § 666, Harris "did not have to possess actual authority over the business, transaction, or series of transactions, that Andrews sought to influence[;] [r]ather, the Government had to prove only that Andrews *intended*, by offering a bribe to Harris, to influence the sewer contract" (citation omitted)); *McNair*, 605 F.3d at 1191 (explaining § 666 "requires only that money be given with intent to influence or reward a government agent 'in connection with any business, transaction, or series of transactions,'" and "does not say 'official act'"); *Abbey*, 560 F.3d at 515, 519–21 (affirming § 666 conviction where the government asserted that "Abbey used his influence and position to assist Rizzo with several land developments" but "did not introduce any evidence establishing that . . . Rizzo and Abbey had an express agreement for a specific official act to be done in return for Rizzo's gift"); *Gee*, 432 F.3d at 715 (affirming § 666 conviction where a jury could find that "money . . . was exchanged for George's influence" in directing contracts towards the organization, because even though George did not have the power to award the contracts "George had plenty of clout and used it to [the organization's] benefit").

Although Second Circuit cases refer to bribery in connection with an official act, the Second Circuit has not squarely held that official acts or duties are required for a

---

(stating "the government must present evidence of a quid pro quo, but an illegal bribe may be paid with the intent to influence a general course of conduct").

§ 666 conviction.[14]  In *United States v. Ford*, the court stated that the defendant "accepted [free media] services 'intending to be influenced' *in her official duties*."  435 F.3d 204, 212 (2nd Cir. 2006) (emphasis added).  The primary focus of *Ford*, however, was addressing whether the jury was properly instructed that the "recipient [of the bribe] must have accepted the thing of value while 'intending to be influenced.'" *Id.* at 212–14.  Although *Ford* suggests that the word "corruptly" in § 666 implies a breach of some official duty, *id.* at 211, the Eleventh Circuit has interpreted the word "corruptly" to mean "dishonestly seeking an illegal goal or a legal goal illegally." *McNair*, 605 F.3d at 1188.  We agree with the Eleventh Circuit that "[t]he requirement of a 'corrupt' intent in § 666 . . . narrow[s] the conduct that violates § 666 but does not impose a specific *quid pro quo* requirement." *Id.* at 1188.

In *United States v. Bonito*, the Second Circuit upheld a jury instruction which "made clear that the corrupt agreement, offer or payment must precede the *official act* to be influenced or rewarded." 57 F.3d 167, 171 (2nd Cir. 1995) (emphasis added).  *Bonito* assumes "official duties" are appropriate in a jury instruction, but the court had no occasion to address the issue because that particular term was not in dispute. *Id.* at 171–74.  Further, the court's affirmance of Bonito's § 666 conviction suggests that the court did not require that the public official have actual authority over the business Bonito sought to influence—there, the purchase of Bonito's property.  Rather, much like Robles did here, the

---

[14] In *Ganim*, the Second Circuit "presume[d] that the same standard for proving a quid pro quo exists under both 18 U.S.C. § 666 and § 201(b)(1), as neither party ha[d] argued that there is, or should be, any difference . . . ." *Ganim*, 510 F.3d at 148 n.7.

public official Bonito bribed "undertook a range of activities that inhered to Bonito's financial benefit" which included setting up meetings for Bonito, becoming involved in negotiations for the purchase of Bonito's property, and contacting officials "to push the deal through." *Id.* at 170, 174. There was no evidence that demonstrated that the public official alone could approve the purchase of Bonito's property. *Id.* at 173–74; *see also United States v. Bahel*, 662 F.3d 610, 637–38 (2d Cir. 2011) (discussing *Ford* and *Bonito*).[15]

For the foregoing reasons, we are not persuaded by Robles's arguments. We hold that § 666 does not require that Robles intended to be influenced in an official act. We thus affirm Robles's § 666 bribery convictions.

## IV.

IN SUM:

We **REVERSE** Robles's § 1346 honest services fraud convictions with respect to Counts 1 through 11, 13 through

---

[15] It may simply be the case that in referring to "official duties," the Second Circuit "was not positing an additional element to the statutory definition of the crime, but instead was explaining the *sine qua non* of a violation of § 666." *United States v. Agostino*, 132 F.3d 1183, 1190 (7th Cir. 1997) (explaining that although a prior Seventh Circuit case referred to a "'quid pro quo'" as being an "'essential element'" of § 666, the "elements of the offense remain those that are set forth in the statutory language" (citation omitted)). As a practical matter, most bribery cases "involve an identifiable and particularized official act, but that is not required to convict" under § 666. *McNair*, 605 F.3d at 1188; *Gee*, 432 F.3d at 714 ("A *quid pro quo* of money for a specific legislative act is *sufficient* to violate [18 U.S.C. § 666], but it is not *necessary*.").

15, 17, and 23 through 25, and Garrido's § 1346 honest services fraud convictions with respect to Counts 23 through 25 because, under *Skilling*, the jury instructions erroneously permitted convictions on the unconstitutional theory of a failure to disclose a conflict of interest.

We **REVERSE** Robles's § 1346 honest services fraud convictions with respect to Counts 16, 22, and 27 and Garrido's § 1346 honest services fraud convictions with respect to Counts 22 and 27, and **ACQUIT** Robles on Counts 16, 22, and 27 and **ACQUIT** Garrido on Counts 22 and 27 because these counts are based on *Skilling*'s unconstitutional theory of a failure to disclose a conflict of interest in a state disclosure form, and because there is insufficient evidence to support Counts 16 and 27.

We **REVERSE** Robles's § 1957 money laundering convictions with respect to Counts 18 through 21 because they are predicated on the flawed honest services fraud convictions.

We **AFFIRM** Robles's § 666 bribery convictions with respect to Counts 33 through 37 because § 666 convictions do not require the defendant intended to be influenced in an official act.

We **REMAND** this case to the District Court for further proceedings consistent with this opinion.

Thus, *United States v. Garrido*, No. 06-50717, is **REVERSED** and **REMANDED**; and *United States v. Robles*, No. 06-50718, is **REVERSED** in part, **AFFIRMED** in part, and **REMANDED**.